UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6317-CR-FERGUSON

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

PETER HOLLAND,

        Defendant.

_____/

## DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT AND MOTION FOR DOWNWARD DEPARTURE

The Defendant, PETER HOLLAND, through undersigned counsel, files his objection to the

Pre-sentence Investigation Report (PSI) and respectfully moves for a downward departure from the

otherwise applicable guideline offense level, and in support thereof, the defendant states:

### OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT

#### Offense Level Computation

Mr. Holland objects to the three level enhancement for assaulting a law enforcement officer

in a manner creating a substantial risk of serious bodily injury pursuant to USSG § 3A1.2(b).  Mr.

Holland denies assaulting any officer during the course of being pursued. The offense section of the

PSI states that while Mr. Holland was attempting to elude capture by the INS agents, he intentionally

rammed his car into a Pembroke Pines Police vehicle. See PSI ¶ 7. This Court should not accept this

conclusory allegation.

Mr. Holland submits that he did not intentionally ram his car into the police vehicle. On the

contrary, he tried to avoid the collision.  See Mr. Holland's post arrest statement, hereto attached as

exhibit 1. Despite being interrogated for over 30 minutes, Mr. Holland repeatedly denied intentionally striking the police vehicle. Mr Holland's version of the incident is further supported by the charges which were filed as a result of the collision. See PSI ¶ 28. Mr. Holland was not charged with assault or any crime requiring proof of intent to cause bodily injury. The government bears the burden of establishing by a preponderance of the evidence the facts necessary to support a sentencing enhancement. United States v. Askew, 193 F.3d 1181, 1183 (11th Cir. 1999). While the preponderance of the evidence is not a high standard, it is not a toothless standard and district courts must ensure that the prosecution meets this standard before adding months or years onto a defendant's sentence. Id. The standard is not met in this case. Therefore, this Court should reject the Probation Officer's recommendation to increase the offense level by three levels pursuant to USSG § 3A1 2(b).

## Offense Conduct

Mr. Holland objects to paragraph 4 of the PSI which states that he had been arrested for domestic violence and possessing a gun after reentering the United States. Mr. Holland emphatically denies these accusations. Mr. Holland's position is supported by Part B, Criminal History Section, of the PSI report Paragraphs 30 to 32 reflect no arrests for domestic violence or weapon possession after the date of Mr. Holland's deportation. Mr. Holland would also submit to the Court that the confidential source who provided this information was probably a relative of his ex-wife. Mr. Holland's ex-wife recently won a significant amount of money in the Florida Lottery. Mr. Holland submits that one of her relatives notified the Immigration and Naturalization Service (INS) of his presence in the United States to prevent him from sharing in the lottery proceeds.

## Criminal History Computation

Mr. Holland objects to the probation officer's assessment of two criminal history points for the sentence he received for his conviction for fleeing and eluding the police and criminal mischief. See PSI ¶ 28. The fleeing, eluding, and criminal mischief charges were part of the conduct of the instant case. Prior sentences for conduct which is part of the instant offense are not to be included in a defendant's criminal history computation. See USSG § 4A1.2(a)(1); United States v. Simpkins, 953 F.2d 443, 446 (8th Cir. 1992). Accordingly, the two points assessed to the fleeing, eluding, and criminal mischief convictions should be subtracted from Mr. Holland's criminal history point total. Although a total of seven criminal history points would still place Mr. Holland in criminal history category four, Mr. Holland raises this objection because he wishes to be sentenced at the low end of the guideline range.

## MOTION FOR DOWNWARD DEPARTURE

Mr. Holland respectfully moves for a downward departure from the otherwise applicable guideline offense level because he has already served a sentence for conduct which was part of the instant offense, and in support thereof, Mr. Holland states:

Mr. Holland was sentenced to a term of imprisonment of one year and one day after being convicted of fleeing and eluding a police officer and criminal mischief. As stated earlier the fleeing, eluding, and criminal mischief were part of the conduct of the instant offense. A district court has authority to depart downward to give a defendant credit for time served on his expired state sentence imposed for the same relevant conduct. See United States v. Otto, 176 F.3d 416, (8th Cir. 1999);

3

United States v. O'Hagan, 139 F. 3d 641 (8ᵗʰ Cir. 1998). Accordingly, Mr. Holland is requesting that

this Court depart downward to give him credit for the year and one day sentence he received as a

result of his conviction for fleeing, eluding, and criminal mischief.

WHEREFORE, the defendant, Peter Holland, requests that this court sustain his objections

to the Pre-sentence Investigation Report, grant his Motion for Downward Departure, and impose a

sentence which is consistent with the facts and arguments set forth above.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By:       _____
          Daryl E. Wilcox
          Assistant Federal Public Defender
          Florida Bar No. 838845
          101 N.E. 3ʳᵈ Avenue, Suite 202
          Fort Lauderdale, Florida 33301
          Tel:   (954) 356-7436 ext. 112

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing instrument was mailed this 9th day of
March, 2000 to Scott Behnke, Assistant United States Attorney, 500 E. Broward Boulevard, 7th
Floor, Fort Lauderdale, Florida 33301; and Silas Saunders, United States Probation Officer, Room
315, United States Courthouse, 300 N.E. First Avenue, Miami, Florida, 33132-2126.

_____
Daryl E. Wilcox

## STATEMENT
## CASE #00-01-03125
## PROPERTY #00-0474
#### Arrest

Today's date is 1/13/2000. The time is 1657 PM. The location is the

Pembroke Pines Police Department. The interrogating officers are Officer Dutton

and Officer Light. Person being interrogated is a black, male, Peter Holland, H O

L L A N D. The date of birth is 8/21/63, who resides at 13766 NW 18 Court in

Pembroke Pines. This statement is being taken in reference to Pembroke Pines

case #00-01-3125, which is classified as an aggravated battery. This offense

occurred at 12251 Pines Boulevard on today's date at approximately 1130 hours.

Q:    Mr. Holland, do you understand that I am a police officer for the City of

        Pembroke Pines and am empowered to take a sworn statement?

A:     Yes, ma'am.

Q:    Raise your right hand. Do you swear to tell the truth, the whole truth, and

        nothing but the truth, so help you, God?

A:     Yes, sir.

Q:    Put your hand down. Okay. Are you giving me this statement of your own

        free will or with no threats or promises having been made to you?

A:     Yes.

Q:    State your name and address.

A:     My name is Peter Holland. I live at 13766 NW 18 Court, Pembroke Pines,

        Florida.

**Statement of Peter Holland - Page 1 of 27**

EXHIBIT 1

Q: Okay. Before I ask you any questions I want to advise you of your rights under the law. Do you understand that I am a police officer?

A: Yes.

Q: Do you...you have the right to remain silent, that is, you need not talk to me or answer any questions if you do not want to, do you understand?

A: Yes.

Q: You have the right to talk to an attorney and have him here with you before we ask you any questions, do you understand?

A: Yes.

Q: If you cannot afford to retain your own attorney and you want an attorney, one will be appointed for you free of charge before we ask you any questions, do you understand?

A: Yes.

Q: If you decide to answer the questions now without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney, do you understand?

A: Yes.

Q: Knowing and understanding your rights as I have explained them to you, are you willing to answer my questions without an attorney present?

A: I'll answer.

Q: Say "yes" or "no".

A: Yes.

**Statement of Peter Holland - Page 2 of 27**

Q:    Should you talk to me anything you might answer to my questions may be

introduced in evidence in a court of law against you, do you understand?

A:    Yes.

Q:    What happened today?

A:    Well, today I got home to my residence in Pembroke Pines and, uh, I was

approached by an immigration officer. He introduced hisself to me. He

said he had a warrant for me. Um, I panicked because, uh, I was

deported and I reentered the US and I knew that if I should go with this

immigration officer I would be taken away from my family for a number of

years and I would be in some kind of federal detention. I panicked. I got

in my van and I ran.

Q:    Did you flee from the INS officer?

A:    I flee from the INS officer. Um, in doing so, I, um, I was...I flee from the

officer.

Q:    How did that happen? Did you run? Did you run away from him?

A:    Well, I started to run first and then he got on the radio and I didn't know

who he was calling. And then I ran back to my van.

Q:    Did you run into the house first?

A:    Yeah, I ran into my house.

Q.    Did he follow you into the house?

A:    No, he did not.

Q:    You ran into the house and then you ran back out?

A:    Yes. Because...

**Statement of Peter Holland - Page 3 of 27**

Q: Back door?

A: ...I went...I tried to go to the back door but he...he went to the back. Then the only...I figured the only way I could get away from him was to drive off—drive my van.

Q: Did you go in and out of your van a couple of times before he...before you left?

A: Yeah.

Q: Did you enter your van...

A: Yes, yes.

Q: What were you doing back and forth in your van, out of your van?

A: Well, I was trying to leave but he kept coming in front of my van and I didn't want to hit him so I kept...I went back in the van. I went to the back door. And then when I went to my back door, then I tried to run through my backyard where he pointed a gun at me. And I ran back in the house. And we did that back and forth about three times. Then I ran...I ran, um, in my house. I stayed there for about 20 seconds. Then I went to my van and he was still around the back. And that's when I...I drove off because he wasn't in front of my van I drove off.

Q: Did you have a gun?

A: Oh, no.

Q: Do you own a gun?

A: I don't own a gun, no.

Q: Is there a gun in your house or in your van?

**Statement of Peter Holland - Page 4 of 27**

A:    No, house, no weapons at all, no guns, no knives, nothing.

Q:    So you left in your van.

A:    Yes.

Q:    And what happened?

A:    Um.

Q:    Did he follow you in his car?

A:    I didn't see him until I get out to Taft Street. Then I looked in my rearview mirror then I saw him and I saw two Pembroke Pines, two marked, police vehicles, which I later found out to be Pembroke Pines police. I drove on to Taft, from Taft Street onto Flamingo Road, then made a right turn.

Q:    Did the officers from Pembroke Pines Police Department pull up behind you before you went onto Flamingo Road? Were they behind you?

A:    They were behind me, yes.

Q:    Did they have their lights on?

A:    Yes, they had their lights on.

Q:    Their sirens?

A:    The sirens...I didn't hear a siren until I got onto Flamingo.

Q:    Did you pull over when you were...when the police were behind you?

A:    No.

Q:    Did you go faster?

A:    I went faster.

Q:    Because you were trying to get away?

A:    I afraid of the immigration officer.

**Statement of Peter Holland - Page 5 of 27**

Q: Okay. So you went onto Flamingo Road?

A: I went onto Flamingo Road.

Q: Which way, north or south?

A: I went south by Flamingo Road and I went through a green light at Johnson Street and head further south. Just before I got to 4th Street, no it was 4th Street and the vicinity of the hospital, I made a left turn heading east into the hospital premises.

Q: Before you did that, did you go southbound on Flamingo and then make a U-turn in the middle of traffic and then continue northbound on Flamingo Road?

A: Yes. That would be correct. I made a U-turn at 4th Street. That's where I made a U-turn up 4th Street and then headed north on Flamingo Road. Then I made a right turn into the hospital premises.

Q: When you made a U-turn, were you aware that was traffic traveling both ways—north and south?

A: There were traffic traveling north and south. It was not...it was not busy.

Q: Did you have any regard for the traffic when you made that U-turn? Did you...did you yield for the traffic or did you pull in front of it?

A: Well, there was only...there were two cars heading north toward me. One of them passed and I got...I got in the...I made the U-turn just before the other one approached.

Q: Okay. So did you yield to them or not?

A: No, I did not.

**Statement of Peter Holland - Page 6 of 27**

Q:    Were the police still behind you?

A:    Yes, the police was behind me.

Q:    Did they have their lights and siren on?

A:    At this point the police had his siren on.

Q:    Did you stop?

A:    I did not stop at that time.

Q:    Okay. So after you continued northbound, you pulled into the hospital
      parking lot?

A:    I pulled in...yeah, I pulled in the hospital parking lot. And, um, I drove
      through the parking lot and...

Q:    Did you have any regard for the pedestrians that were walking throughout
      the parking lot?

A:    Yes.

Q:    You yielded to the pedestrians?

A:    There were no pedestrians in the road.

Q:    How about cars?

A:    There were no cars. The cars were parked.

OL:   How about at the hospital entrance when you went underneath the
      overhang?

A:    There were no...there were no pedestrians in the roadway. No one had to
      jump back. No one had to, um...

Q:    To run to get out of the way of your vehicle?

**Statement of Peter Holland - Page 7 of 27**

A:    No one had...no one ran out of the way.  There was no cars that were
       driving that I had to avoid being hit, to hit.

Q:    When you traveled into the patient pickup at Memorial West...

A:    Right.

Q:    ...you made entry through the exit route.  Do you know how fast you were
       traveling?

A:    Well, there were, uh...

Q:    No, I...first...wait...

A:    I have no...no, I don't know.

Q:    Do you have any idea?

A:    No.

Q:    Do you think you were doing 35?

A:    It's possible.

Q:    Think you were doing 50?

A:    I couldn't be doing 50 in there.

Q:    You don't think so?

A:    No.

Q:    How do you know?

A:    Because my van is an Econoline van.  It doesn't go that fast in the first
       place.  Plus I was in an area, in a hospital area, and I was...I was, even
       though, I was driving in a reckless manner trying to elude the immigration
       official and the...

Q:    And the Pembroke Pines Police Department.


**Statement of Peter Holland - Page 8 of 27**

A:     ...and the...and the...and the Pembroke Pines police, um, I was trying to

       be as careful as I could not to hit anybody. So I don't think...the van is

       slow and I was in a parking lot area so I don't think I was doing 50.

Q:     Did you have any regard for the traffic that...the traffic signs that were in

       the parking lot? Did you stop at the stop signs?

A:     I stopped at the first stop sign.

Q:     You did?

A:     Yes.

Q:     Were the police behind you?

A:     Yes.

OL:    At the first stop sign?

A:     Yes.

OL:    Where did you first see the police?

A:     I saw the police on Taft Street.

OL:    And what was the cross on Taft Street?

A:     Flamingo. They don't have a light there on Flamingo. I didn't go...

OL:    You didn't see the police at...at 136 Avenue?

A:     I don't remember.

Q:     Do you remember pulling over just passed the high school onto the grass

       and then pulling back onto the roadway? There was a tow truck or

       something on the side of the road. Do you remember pulling off the road

       and then pulling back on the road just after the high school on Taft Street

       before you approached Flamingo?

**Statement of Peter Holland - Page 9 of 27**

A:    Everything was going so fast. It's possible. I don't remember.

Q:    Okay. When you came out of the hospital parking lot, what did you do

       then?

A:    Um, I went...there's a (inaudible) that's adjacent to the hospital parking lot

       a little further south.

Q:    Were you still fleeing the police?

OL:   Let's back up a minute.

A:    Yes.

OL:   You left the hospital parking area. Do you remember what lane you went?

       Did you go through the regular in the normal direction or did you go exit

       through the entrance lane?

A:    I don't recall if there was an entrance or exit lane in the hospital. I was just

       trying to get away.

OL:   Okay.

Q:    Were there police still behind you?

A:    Yes.

Q:    Did they have their lights and siren on?

A:    Yes.

Q:    Were they close or were they back away?

A:    They were like...I don't remember. Um, like I said, I was concentrating on

       getting away. I knew the police was behind me and I knew the

       immigration officer was behind me but I just...I don't look through the

       rearview to see what distance. I was looking ahead to make sure that,

**Statement of Peter Holland - Page 10 of 27**

you know, in trying to escape that at the same time I didn't want to damage any...any vehicle or...or...or human.

Q: But you think you were...you think you could have been doing 35 miles an hour in the parking lot of the hospital?

A: 35 is possible.

Q: You don't think that was endangering anybody?

A: The mere thought that I was fleeing, um, I suppose, you know, I could have been endangering anybody. Let's put it this way. If the hospital lot was crowded with pedestrians, I would have stopped.

Q: Okay. Well, the patient pickup was full of pedestrians standing there waiting to be picked up so we'll move on from there. When you pulled into...onto the Parameter Road after the hospital, what happened next?

A: Um, I don't quite remember. The roads, as you say, but all I know is that I...I approached the (inaudible) building by the Pembroke Lakes Mall area and, um...

Q: There was a three way stop there. It's a three way stop. There's stop signs three ways.

A: Okay.

Q: Did you stop there?

A: I don't recall.

Q: Did you strike a Pembroke Pines police car there?

A: At the three way stop?

Q: Uh, huh.

**Statement of Peter Holland - Page 11 of 27**

A:    No.

Q:    Okay. When did you hit the police car?

OL:   Did you strike the police car at all?

A:    Yes. I remember hitting a police car. Um, when I...when I drove, I think,

      from the rear, if I'm not mistaken of the (inaudible) building approaching

      the front of the building, and in front of me came a police car and it

      stopped and I swerved to my right to avoid hitting the car and I heard a

      loud bang. The front of my car, my left front, hit his car. And then I saw

      him got out and told me to stop. And I turned in the parking lot and I

      stopped the car in the parking... in front of (inaudible) I stopped my van.

Q:    Okay. Let's go back just a bit. At this...this spot where...when you are

      going to make a right hand turn and when you made that right hand turn

      the police car was in front of you?

A:    The car...okay. when I was approaching the front of the building, the car

      was not there.

Q:    Okay.

A:    Then on approaching the building the car just came from...from nowhere

      like it's coming from the front of the store and it stopped.

Q:    Uh, huh.

A:    Okay.

Q:    Was it in front of you?

A:    It was in front of me.

Q:    Was it facing you?

**Statement of Peter Holland - Page 12 of 27**

A:    No, it was not facing me. It was...it was side...it was, uh...

Q:    At an angle?

A:    ...broadside. Yes.

Q:    Okay. Were you able to drive around it without striking it as you earlier said?

A:    That's what I tried to do.

Q:    You...

A:    But the space...the space was small.

Q:    Did you know it was too small?

A:    At that time no.

Q:    So you thought you could get through?

A:    I thought I could get through.

Q:    But when you got close and realized that you couldn't, did you stop?

A:    It's a split second thing.  I...there...I couldn't...I didn't realize if I could or could not get through at the time.

Q:    Well, just as you were driving through the hospital parking lot telling me that you had concern for pedestrians and vehicles, when you were at the point where there's a police car in front of you and there's a spot where you think you are going to drive through and you realize that you're not going to fit, did you stop?

A:    I didn't realize that I couldn't fit.  That's the thing.

Q:    How long have you been driving?

A:    I've been driving a long time.

**Statement of Peter Holland - Page 13 of 27**

Q:   Right. So you kind of figured whether you were going to get through or not. If you didn't think you were going to get through...

A:   This is not...this is not...this is not...

Q:   ...you would have stopped, right?

A:   ...this was not normal driving conditions.

Q:   Okay. Exactly.

A:   This was...I was...I was being chased...

Q:   No, no, no, you were fleeing.

A:   and I was...I was fleeing and I was trying to get away.

Q:   So when you saw the police car in front of you...

A:   And it was a split...when I saw the police car it was a split second thing.

Q:   And that's how it would have been with pedestrians at...in the parking lot earlier. It would have been a split second thing if someone would have stepped out in front of you.

A:   Yes.

Q:   So you had a vehicle in front of you—a police car. Did you stop?

A:   I could not...even if I wanted to stop at the time, I...I...the car...my van was going so fast it was...it would have been...it's a good thing that I swerved because if I had just, you know, kept going I would have hit it broadside.

Q:   So when you were trying to fit through did you accelerate?

A:   Um, I could have.

Q:   Yeah?

**Statement of Peter Holland - Page 14 of 27**

A:   I could have. I'm not sure. I was trying to avoid hitting the car.

Q:   After you hit the car...

A:   No, I...no, after I hit the car...

Q:   Did you stop?

A:   After I hit the car, yes, momentarily.

Q:   What did you stop for?

A:   I wanted to see if the officer was all right.

Q:   And did you?

A:   Yeah, well he got out and he told me to stop.

Q:   Weren't you already stopped?

A:   I was stopped at...when he got...when I noticed he got out and held up his hand like that, then I realized that he was okay, then I pulled into the parking lot and turned and stopped.

Q:   No, you pulled into the parking lot and then your tire popped and went flat on your van.

A:   I didn't even realize that the tire was flat 'til I got out.

Q:   And you had a flat tire on your van and your van was traveling anymore at the speed it was. That a front...front damage...front left damage in your tire had popped and it had gone flat.

A:   If you notice...if you notice I parked the van. I did not stop in the middle of road or anything. I parked it. Being that I intended to stop. If the tire blew out while I was fleeing then that's different but I parked it. I swerve...I turned as I was park...to park in the parking space.

**Statement of Peter Holland - Page 15 of 27**

Q:    So you don't know... so you don't know when the tire blew out?

A:    No, I did... I had... I didn't even know. I know that the van got hit. And I feel like a funny sound, a funny vibration, but I didn't know the tire was blown out.

Q:    So when you parked you basically gave up from fleeing?

A:    I gave up. I got tired of it.

Q:    So can I say that when you saw that police car in front of you, you had the opportunity at that moment to stop and give up but you did not?

A:    It would have... when the police car pulled out in front of me...

Q:    But it didn't really pull out in front of you, it actually pulled up and stopped, correct?

A:    When the... when the police... the police car came from nowhere and pulled in front of me. I had to swerve to avoid hitting the police car, the police officer. Because if I continued the car would have... the van would have hit it smack in the middle and maybe the officer would have been hurt.

Q:    Did you have the option of stopping at any time?

A:    I couldn't... I could not at the speed I was going and...

Q:    How fast were you going?

A:    At that time, I don't know, maybe 35 somewhere around there.

Q:    Do you know how fast you were going?

A:    I have no idea. But like I said, at the time when the car pulled in front of me if I had stopped, if I had mashed the brake, it would not have stopped

**Statement of Peter Holland - Page 16 of 27**

in time. It would have hit the car broad side. But I mashed the break and I swerved to my right and that...that's avoided hitting the car and probably cause human damage.

Q:  You said that the car, that the police car, stopped in front of you? You were...you were moving, right? You had never stopped. You were traveling the whole time. You were fleeing from the police officers that were behind you and when you all the sudden saw a police car right in front of you, did you stop or did you accelerate?

A:  When I saw the police...when the police car pulled in front of me, I mashed my brake and I swerved to my right.

Q:  And then what did you do?

A:  And then I heard the bang.

Q:  Then what?

A:  Then I knew I hit him, okay. And then his car, I think, his car the impact pushed his car out the way and then I accelerated. And then I looked first to see, you know, if he was okay. He came out...he opened the door and came out and hold up his hand like he wanted me to stop.

Q:  Uh, huh.

A:  And I accelerated, turned, I turned into the parking lot and then I parked my van in the parking space. There were...there were...there was not much cars in the parking space. It was scanty so there was a lot of parking space and I parked the car in the space.

Q:  When you passed the police car after you hit it...

**Statement of Peter Holland - Page 17 of 27**

A:    Yes.

Q:    ...were there other police cars behind you?

A:    They came, um, eventually, yes.

Q:    How long?

A:    A few seconds later, not even, maybe ten seconds, maybe later.

Q:    So they weren't actually...so they weren't actually following right behind you whenever you hit the police car, were they?

A:    They were following me.  They probably weren't as close but they were following me.

Q:    Okay.

A:    I was...the police that were in pursuit, that were following me, I suppose that going through the hospital area and the parking lot area, they had to drive with a certain amount of caution.  So maybe they slowed down, it slowed them down a little bit.  Also, I slowed down a bit going through that area particularly the hospital area.  I just want to go on record to say I had no intention of hurting anybody.  I had no intention of hitting that police car and I was concerned about the police officer's well being.

Q:    Did you always have the option to stop?

A:    There is always the option to stop.  There is a thing called adrenaline and when it starts working and your trying to escape, it works overtime and you do crazy stuff.  But, you know, I'm really sorry about what happened.

Q:    Okay.  The whole time you were fleeing was the opportunity there to strike another vehicle or a pedestrian?  Was the opportunity there the whole

**Statement of Peter Holland - Page 18 of 27**

time that you were fleeing from the police and INS? And did you always

have the option of stopping through the entire drive?

A:   Luckily, luckily at that time, um...

Q:   I'm sorry, I asked you two questions at the same time. Let me ask you the

first.

A:   Okay.

Q:   During the time that you were fleeing from the police was there an

opportunity for you to strike another car or a pedestrian?

A:   There was one time when I got close to...I got close to a...a pedestrian,

no. But there was a time when on Flamingo Road when there was a car

that was driving slow in front of me and I had to, in the...in the...in the far

right lane, and I had to pull over on the soft shoulder to pass him.

Q:   So at anytime during this time you were trying to get away from the police,

you could have hit somebody or another car, right? And your other option

would have been if you just would have stopped none of this would have

happened, right?

A:   I was scared, ma'am.

Q:   Okay, but...all right, but is that right that if you would have stopped there

would have been no chance for anyone to be injured or any property to be

damaged?

A:   If I had stopped...if I didn't chase...if I did not run at all obviously there

would...there would have...there would not have been any damage to any

**Statement of Peter Holland - Page 19 of 27**

cars or...or injury to anybody if I had stopped or if I hadn't started to flee from the officer, the immigration officer.

Q:    Uh, huh.  So you're saying you didn't intentionally crash into that police car?

A:    Oh, no.  I wouldn't...

Q:    You accidentally hit it while you were fleeing?

A:    As I said before, I'm an ex-police officer from Jamaica and I the feeling and I know what it is and I would never intentionally hit a police officer.

Q:    So you're saying you did it on accident?

A:    It was an accident.

Q:    While you were fleeing?

A:    I am at fault because of the fact that I was fleeing from the officer and if I had stopped then all of this would not have happened.  But in the process of fleeing from the officer his came out of nowhere and the only, in fact, I think that by swerving I prevented, um, damages, worse damages, to the (inaudible) or possibly to the car or to the officer.

Q:    (inaudible) you actually tried to get passed the police officer and get away, right?

A:    Swerving was my only option.  If I hadn't, even if I had tried to stop at the speed I was going and the car came in front of me at the speed, if I breaked without swerving, I would have hit the car broadside.  I would have his the car in the door.  And there's a possibility that the officer would have been hurt.

**Statement of Peter Holland.- Page 20 of 27**

Q: And a possibility that you would not have been able to continue to flee, right?

A: The possibility that I would have been hurt also, yes.

Q: Okay. That would have stopped that fleeing that you were doing, right?

A: Well, it didn't happen so I don't know. But at that point with me hitting that police officer's car, I got to realize then that this was hopeless and, you know, it wasn't worth going through, you know. So I parked the car got out with my hands up and I surrendered.

Q: Officer Light do you have any questions for him?

OL: Why did you continue to flee after you got hit, or hit the police car?

A: I did not flee after I hit the police car. I just...I pulled...I pulled away from the police car and then I looked to see if he was okay and when I realized that he was okay then I turned into the parking lot and stopped.

OL: Do you know that...

A: If I kept fleeing I would have...I would have...I would head further south in the parking lot but I didn't. I turned the car inside a parking space.

OL: Can you tell me why you didn't park it in the first parking spot—the first row of parking spots? Why did you drive to the...

Q: So far?

OL: ...complete end of the parking lot?

A: I'm sorry, sir, I did not go to the complete end of the parking lot. It was like midway.

OL: Oh, no, no, no.

**Statement of Peter Holland - Page 21 of 27**

A:    It was like midway.

Q:    It was pretty far. We could...we could show you on a map from the place where you hit the police car to the place that you actually stopped is a pretty lengthy distance.

OL:    You stopped in front of a store called Kids-R-Us.

A:    Kids-R-Us.

OL:    And you had to pass...to get to Kids-R-Us you had to pass Upton's. You had to pass Toys-R-Us and then you pulled into the last row of Kids-R-Us. Is it because your tire went flat and you couldn't drive anymore.

A:    I didn't know that my tire went flat, sir.

Q:    Is it because your car wasn't going any faster?

A:    It was...it was because...the reason...the reason why...there are twofold. my reasons for stopping. the impact with the police car and the fact that the...I did hear, I knew my van was damaged and I just didn't want to continue no more.

OL:    Do you recall making any statements on scene?

A:    On the scene?

OL:    On the scene.

A:    I remember asking how the police officer was doing. If he was all right.

OL:    You don't recall making the statement saying that you kept running because you had nothing to lose? Do you remember making that statement at the time?

A:    Not in that words, no. No, I did not say that in that way.

**Statement of Peter Holland - Page 22 of 27**

OL:   Well, what words did you use?

A:   I think I said that I, um, when the immigration officer approached and, uh, and the Pembroke Pines police was there...I don't want to say what I said because I really don't recall exactly what I said. But what I was thinking at the time when I flee, fled, facing the immi...the immigration with what I have done...I wasn't fleeing from a bank robbery. I was fleeing from...I didn't commit a crime at that time. I was just in the country illegally and I was afraid of the immigration officer.

Q:   Okay. It's 5:28, excuse me, 1728 PM. I'm going to stop the tape temporarily to turn it over. Okay, we're back on. I just have to turn it on.

A:   Okay. I just wanted to say something that's all.

OL:   Go ahead, say it.

A:   I wanted to say something off the record.

OL:   You can't say anything off the record.

A:   Okay. All right. Um, I made a mistake by trying to flee from law enforcement officers. It was wrong. I hit the police car. I didn't intentionally hit the police car, okay. And I am really sorry for all the problem that I caused the Pembroke Pine Police Department—all the manpower they had to use to pursue me. And that's about it.

Q:   After you were arrested, we looked in your wallet and you had some driv...a Florida driver's license and a Florida ID card.

A:   Right.

Q:   Both of those cards were in your name.

**Statement of Peter Holland - Page 23 of 27**

A:    Yes.

Q:    It had incorrect dates of birth.

A:    Right.

Q:    Was that done intentionally?

A:    Yes.

Q:    Okay. You had social security cards with your name and a social security card in another person's name with two different numbers. Were you aware of that?

A:    The...

Q:    You actually have three social security cards.

A:    I had a social security card.

Q:    I just want to know if you applied for a social security card under different names with different numbers.

A:    When I reentered in the US...

Q:    Uh, huh.

A:    ...common sense would tell anyone that is living in the country illegal that you cannot work under this number that you were deported on. So I intentionally, I tried to...I tried and I got a different social security card.

OL:   By using the...

A:    By...by...I used my same name but I just changed my date of birth.

OL:   You had a Haitian passport also?

A:    Yes.

OL:   Is that how you obtained a false driver's license?

**Statement of Peter Holland - Page 24 of 27**

A:     That's how...that's how I obtained a Florida driver's license.

OL:    And that's how you obtained a new social security card?

A:     That's correct sir.

OL:    How did you obtain the passport—the Haitian passport?

A:     I bought it.

OL:    Where?

A:     I went to...I got it from a Haitian person.

OL:    And you attached your picture to it?  Put your name on it?

A:     Yes.

OL:    So you...so you purchased a fake passport with the intentions of getting a

       new social security and license, is that correct?

A:     Yes.

OL:    Okay.  You also had a birth certificate and another social security card.

       The birth certificate and social security cards were in the same name,

       right, but not your name?

Q:     The name that was registered to the van.

A:     Yes, yes.

OL:    And what name is that?

A:     (inaudible) Melford Ton(?)(inaudible) is someone that I know that he...I

       think he moved to either Jacksonville or Tampa and he doesn't use his

       identity.  And he bought the van.  I gave him the money to buy the van and

       four or five years ago he bought it in his name and I make the payments

**Statement of Peter Holland - Page 25 of 27**

on the van and I take care of the van. He gave me...he left his papers

with me but I never used them for anything.

Q: But were you...were you going to use them?

A: I had no reason to use them because I already had a Florida driver's

license and social security card in my name. There was no reason for me

to use his name—his documents.

Q: If you hadn't gotten your driver's license and social security number could

you have used those items to get them?

A: It would have been extremely difficult under the new policy that the state

of Florida had in obtaining driver's license.

Q: Anything else you want to tell us in regard to this incident today that we've

forgotten to ask you?

A: Yes. Um, the State laws and the Federal laws are different, as we all

know. Uh, a person may commit a bank robbery and give up, surrender to

the police...and...but for immigration...because there are certain

recourses that they can go by whereas, for example, you...there is

probation, there is house arrest, there are different avenues other than jail

time. With the immigration it would fall under Federal, there is no recourse

for people like me. I have a family here. I have a nine-year-old girl. I

have a twelve-year-old girl. I have a seven-year-old son who depends on

me. The US Immigration deported me for petty theft and they just picked

me up and threw me out of the country and I came back because I had to

take care of my family. I had (inaudible) to finish and I've been back here

**Statement of Peter Holland - Page 26 of 27**

00-6317-0026

for a year. I've never committed a crime. I've had a good job. I'm a contractor at FPL and I work very hard. I just purchased a brand new house.

Q:  But you knew that if they caught you, you would go back.

A:  I knew if I got caught I would have been in trouble but...

Q:  And that's why you are trying to explain to us why you fled.

A:  I...I...I...

Q:  It was that important to you.

A:  ...I fled because there was no...there is no way...there is no recourse for me when it comes to immigration because I just look at 10, facing 10 years, in the Federal prison.

Q:  Okay. Is there anything else that you want to tell me about what happened today other than that?

A:  Well...one more...the only other thing I would like to say that, and I think I said before that, I'm sorry...I'm happy that no one got hurt and it was a very stupid thing for me to do and I'm really sorry about it.

Q:  Officer Light anything else?

OL:  I have nothing further.

Q:  Statement's going to be ended at 1735.

Transcribed:ll

**Statement of Peter Holland - Page 27 of 27**